LEONARD COOPERSTEIN AND ESTATE OF MARCIA COOPERSTEIN, DECEASED, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cooperstein v. Commissioner
Docket No. 6940-77.
United States Tax Court
T.C. Memo 1984-415; 1984 Tax Ct. Memo LEXIS 260; 48 T.C.M. (CCH) 776; T.C.M. (RIA) 84415; August 6, 1984. *260 Held, petitioner's motion for reconsideration of the Court's findings of fact and opinion in Cooperstein v. Commissioner,T.C. Memo. 1984-290, or request for a further trial denied. Held further, respondent's motion for reconsideration of the Court's opinion granted. David K. Shuffman, for the petitioners. Patrick E. Whelan, for the respondent. STERRETT
SUPPLEMENTAL MEMORANDUM OPINION STERRETT, Judge: On June 26, 1984 petitioner Leonard Cooperstein filed a motion for reconsideration of the Court's findings of fact and opinion filed in this case on June 4, 1984 (T.C. Memo. 1984-290). In the alternative, petitioner requested a further trial. On July 5, 1984 respondent filed a motion for reconsideration of the Court's opinion. Petitioner's Motion and Request for Further Trial Factual Finding
One of the factual issues presented to this Court in T.C. Memo. 1984-290 was whether petitioner received unreported gross income from the sale of silver to Edward B. McAlpine, Refiners of Precious Metals (McAlpine) during 1968 using the alias, Jack Lazaar.Based on the totality of the evidence in the record and our *261 observations at trial, we concluded that petitioner and Jack Lazaar were one and the same individual. Petitioner has asked us to reconsider the foregoing factual finding. In support thereof, he raises a number of points, some of which we did not specifically address in our opinion, but all of which were taken into account by us in reaching our initial decision. Petitioner states that none of the recipients of the third-party checks drawn by McAlpine to the order of Jack Lazaar in 1968 identified petitioner as the person who gave them the checks. The revenue agent's testimony in this respect was that the third-party recipients "would not confirm" that petitioner was the person who gave them the checks. We did not at the time we reached our initial decision, and still do not, view such refusal to identify petitioner as determinative of petitioner's identity. Petitioner also states that the handwriting analysis conducted by respondent in an attempt to determine whether the signature of Jack Lazaar matched that of petitioner was inconclusive. We recognized this fact in reaching our initial decision and accorded no weight to the analysis. However, since petitioner has raised *262 this point on motion, we do note that, on the other hand, there is nothing in the handwriting analysis report particularly favorable to petitioner. In this connection, the report specifically states: There were some similarities noted between the questioned endorsements Jack Lazaar on Exhibits Q-1 thru Q-9, Q-11 thru Q-21 and Q-23 thru Q-30 and the specimen handwriting of Leonard Cooperstein on Exhibits K-1. However, it appears that Cooperstein attempted to disguise his handwriting when the specimens were taken. This is particularly noticeable when he wrote the names Jack Lazaar on the white cards. This writing deviates in slant from his writing on POD Form 582. (Exhibit K-1a). The specimen handwriting of Cooperstein also contains tremor, which in this particular case, would indicate a true picture of his normal writing was not obtained. Therefore, it cannot be definitely concluded that Cooperstein is the author of these questioned endorsements. Petitoner further states that one of respondent's witnesses, Howard Sutton, testified that McAlpine personnel at the entrance window often identified persons making deliveries other than petitioner as being Jack Lazaar when notifying *263 him that material was about to be received. Petitioner refers to the following testimony (questions by petitioner, answers by Howard Sutton): Q * * * In this time of seeing the van [that delivered the silver] did you ever notice a different color van besides one? * * * A * * * Well, in other words, many people came. * * * In other words, one or two individuals weren't the only individuals that ever came at different times to the refinery, came to different sections of the refinery, if that is what you are asking me, yes. Q Yes. I am referring to the four Jack Lazaars. A Oh no. I don't remember about four Jack Lazaars. Q Okay. When these people came or brought material, other than myself, would they say, "For Jack Lazaar," or "Jack Lazaar"? A The office would tell me. Q And what * * * would [they] say, "Jack Lazaar is outside"? A They would say, "There is material up there. Jack Lazaar is there and the material." Q That didn't necessarily mean that Jack Lazaar himself was there? A Not all the time, no. We did not find the foregoing testimony of particular assistance to petitioner. In the first place, Sutton's testimony was unclear and was susceptible *264 to the interpretation that Lazaar was not the only person who ever came to the refinery for any purpose. Even if we interpret Sutton's testimony to mean that people other than petitioner delivered materials on behalf of "Lazaar," we still do not believe that testimony refutes our finding that petitioner and Lazaar are one and the same. In other words, petitioner, as Lazaar, may well have employed agents to make some of his deliveries. Further, both Sutton and Virginia Dygd, who manned the entrance window at McAlpine, identified petitioner's picture as being a picture of Jack Lazaar and testified at trial that petitioner is the person they recalled to be Jack Lazaar. Finally, petitioner reiterates on motion that he did not have the finances or physical capabilities of conducting a "Lazaar-sized" operation and that he never traveled internationally, making it impossible for him to establish the type of international network utilized for laundering the McAlpine checks. We did not feel the need at the time we reached our original decision, nor do we now, to determine precisely the manner in which petitioner conducted his business affairs. We had only to determine that petitioner, *265 using the alias Jack Lazaar, received unreported gross income in the amount determined by respondent from the sale of silver to McAlpine during 1968. Petitioner has not offered us any persuasive reason why we should upset our original factual determination. Accordingly, we will not alter that determination. Credibility
We stated in our original opinion that we were unable to credit more than minimal weight to petitioner's highly incredible and clearly contradictory testimony. In his motion for reconsideration, petitioner discusses this aspect of the opinion at some length. First, petitioner would have us overlook the inconsistencies and contradictions in his testimony relating to the identity of Jack Lazaar, explaining that they were "directly * * * [traceable] to [his] counsel's late entrance into these proceedings and with it, the strongest recommendation to tell the truth." That petitioner prosecuted much of his case pro se certainly did not give him carte blanche to toy with the truth, shifting from one inconsistency to the next, and hence with our endeavor to redetermine his tax liability. Second, petitioner states in his motion that his credibility was *266 revived with the testimony of his two witnesses, Jack Seals and George Maglaras, and the documentary evidence produced by Maglaras at trial. As we stated in our opinion, we did not find those witnesses' testimony supportive of petitioner's testimony insofar as it related to the identity of Jack Lazaar. We note, however, that we did rely heavily on Maglaras' testimony relating to the existence of a partnership between petitioner and himself in 1969 and 1970 and the documents produced by Maglaras to reduce substantially the asserted deficiency for the year 1970. Finally, petitioner states: It is further submitted that the Court appeared to be just a little bit confused, albeit because of the complexity of the case and the earlier inconsistencies, when it stated on page 19 of the Opinion: Petitioner's credibility dropped a little lower in our estimation when after testifying that Lazaar hired him to make deliveries to McAlpine in return for $200 each trip, he testified that Maglaras made the partnership deliveries because petitioner "was unable to deliver the material." Further, we are left to wonder what petitioner could have hoped to gain from his alleged arrangement with Lazaar *267 in light of the fact that he apparently paid Seals $200 for each delivery to mcAlpine. * * * Maglaras never made deliveries for Jack Lazaar. Maglaras entered the picture in 1969 after Petitioner's relationship with Lazaar ended.Maglaras deliveries to McAlpine were made for the de facto partnership between Maglaras d/b/a G. M. Coins and Petitioner d/b/a Lee Lee Coins. As for the $200 paid to Seals for deliveries on behalf of Jack Lazaar d/b/a Jersey Trading, Petitioner stated that he received $200 for himself, over and above expenses, which included the cost of drivers. We did not intend to imply in the above-quoted excerpt from our opinion that petitioner hired Maglaras to make deliveries for Jack Lazaar. Our sole intent was to provide a further example of what we perceived to be inconsistency in petitioner's overall testimony. Specifically, we found petitioner's stated inability to make partnership deliveries somewhat inconsistent with his earlier statement that he was hired by Lazaar for the very purpose of making silver deliveries. With respect to the $200 payment per delivery, we find nothing in the record to support petitioner's contention that he received $200 for himself *268 over and above expenses. Cost of Goods Sold
With respect to the year 1968 we sustained respondent's determination of a deficiency based on gross receipts without reduction for cost of goods sold. In his motion, petitioner requests that we allow a reduction in his gross receipts by his cost of goods sold in the event we still believe he is Jack Lazaar. At one point in the trial, respondent stated that it was his "understanding that we have stipulated that there are 750 ounces of pure silver * * * [in] a $1,000 bag [of silver coins] * * *." It was stipulated at trial that $60 per 1,000 ounces was a representative charge for melting silver. It was further stipulated that during 1968 coin dealers were paying a premium for silver coins of 14 percent over the face value of a $1,000 bag of silver coins.Respondent never stipulated that any of these costs represented Jack Lazaar's cost of doing business, and on brief he objected to using such figures as Jack Lazaar's cost of goods sold. Petitioner sought to establish that coin dealers were willing to pay $1,140 for a $1,000 face value bag of silver coins through advertisements placed in copies of the "Coin Dealer Newsletter" *269 published in October, November, and December of 1968. In our opinion we declined to accept those publications as Jack Lazaar's cost of doing business. We have re-examined these publications and we continue to believe that they do not provide sufficient evidence of Jack Lazaar's cost of goods sold. The McAlpine invoices reflecting purchases of merchandise from Jack Lazaar variously described that merchandise as silver scrap, silver bars, old silver scrap, impure silver scrap bars, and impure silver. Any calculation that we might make with respect to the cost to petitioner of the foregoing merchandise would be mere guesswork at best. Petitioner having failed to come forward at trial with credible evidence to support a reduction in the unreported receipts, we sustained respondent's determination of the 1968 deficiency based on gross receipts. Petitioner has set forth nothing in his motion that convinces us that our decision was erroneous. Accordingly, we will not alter that decision. Bank Debit Advice
In formulating his deficiency for 1970, respondent included in petitioner's gross income a $12,267.81 item, which he determined petitioner, doing business as Lee Lee Coins, *270 received on a silver sale to McAlpine. Although we substantially reduced respondent's 1970 deficiency determination, we agreed with respondent's conclusion that petitioner, doing business as Lee Lee Coins, received a $12,267.81 payment from a silver sale to McAlpine. In his motion, petitioner states that respondent did not produce one shred of evidence showing that the $12,267.81 amount was paid to or linked to a payment to petitioner or Lee Lee Coins. The $12,267.81 item was taken from a copy of a bank debit advice memo reflecting a charge to the account of Edward B. McAlpine for funds transferred to Lee Lee Coins.We believed at the time of our initial decision, and continue to believe, that the bank debit advice memo sufficiently links the payment to petitioner. Request for Further Trial
Petitioner requests that we grant him a further trial should we not see fit to grant his motion for reconsideration.At such trial, petitioner states that he would have present additional witnesses, including one Harriet "Doe." Petitioner further states that his "eleventh hour efforts to subpoena Harriet 'Doe,' Jack Rubin alias Jack Lazaar's secretary were rendered impossible via *271 the fact that she had apparently changed jobs, and could not be located in time for the last day of the trial." The record in this case clearly reveals that the Court granted considerable leeway to petitioner's questionable litigating tactics. Even though this Court had the distinct impression that petitioner's request at trial for further time to bring in additional witnesses was a mere attempt to delay proceedings, and so stated, it nevertheless after 2 days of testimony continued the trial to a future date pursuant to petitioner's request. However, the Court at that time made it abundantly clear to petitioner that it would not permit petitioner to engage in any more tactics designed to impede the completion of the proceedings in his case. When the trial commenced again petitioner disclosed that Jack Lazaar was an alias for one Jack Rubin. Petitioner testified that he turned over to Rubin all of the McAlpine checks drawn to the order of Jack Lazaar and that Rubin would have his secretary, Harriet, endorse those checks. We view with no small skepticism petitioner's statement in his motion that he was unable to subpoena Harriet "Doe" because she had changed jobs and could *272 not be located in time for trial. The following testimony with respect to Harriet "Doe's" identity seems clearly to belie that statement (questions by petitioner's counsel, answers by petitioner): Q Mr. Cooperstein, in your efforts today to identify the real Jack Rubin, you testified that his secretary would come in and sign the checks. To the best of your knowledge * * * do you remember her name? A Harriet. Q Do you remember her last name? A No, I don't. Q Do you have any idea where she might be located today? A Yes. Q Can you tell us where that might be? A 62 West 47th Street. Q Do you have any idea where she might be employed? A Yes. Q Can you tell us where? A Under the name of Murray Jewelers. * * * Q And so if the Government were actually interested in ascertaining the true identity of Jack Lazaar, they could start with this Harriet? A Yes. The testimony proceeded as follows (questions by respondent's counsel, answers by petitioner): Q Harriet Doe, is that the secretary listed on your list of witnesses as being at 62 West 47th Street? A Yes. Q And she is still there today? A I understand she is. Q Are you calling her as a witness? *273 A No. In light of the foregoing, we do not believe justice would be served by reopening the record in this case for the presentation of any additional witnesses. Petitioner's motion for reconsideration and request for further trial is denied. Respondent's Motion
Respondent requests that we reconsider our opinion with respect to the determination of petitioner's 1970 deficiency. In arriving at the deficiency in petitioner's Federal income tax for 1970, respondent determined that petitioner, doing business as Lee Lee Coins, had unreported gross receipts from silver sales to McAlpine in the amount of $63,267.81, composed of the following five items: Date
Check No.
Amount
1/1/70
$20,000.00
1/2/70
57513
15,000.00
1/2/70
57514
12,000.00
1/23/70
57637
4,000.00
1/30/70
Bank debit advice
12,267.81
In our original opinion, we eliminated the $20,000 item, because we did not believe that the record supported its inclusion in petitioner's gross income for 1970. In addition, we concluded, based on an overall examination of the documents in the record and the testimony of petitioner's witness, George Maglaras, that adjustments should be made *274 to the $15,000, $12,000, and $4,000 items. Specifically, we concluded that petitioner received $7,500 in gross receipts with respect to the $15,000 item and $6,000 in gross receipts with respect to the $12,000 item. This conclusion was based on evidence in the record indicating that the receipts with respect to those two items were divided equally among petitioner and Maglaras pursuant to a joint venture agreement. However, we further concluded that petitioner had presented sufficient evidence for us to determine tha his overall gross profit with respect to those two items was only $95.71. With respect to the $4,000 item, we concluded, as had respondent, that petitioner did receive the $4,000 as gross receipts. However, we further concluded that petitioner had presented sufficient evidence for us to determine that his gross profit with respect to the $4,000 item was only $395.42. Finally, with respect to the $12,267.81 item, we concluded, as had respondent, that petitioner did receive the $12,267.81 as gross receipts. We were unable to determine what portion of the $12,267.81 gross receipts represented gross profit. The foregoing conclusions were summarized in our opinion as *275 follows: Date
Check No.
Gross Receipts
Profit
1/2/70
57513
$ 7,500.00
$ 95.71
1/2/70
57514
6,000.00
1/23/70
57637
4,000.00
395.42
1/30/70
Bank debit advice
12,267.81
$29,767.81
$491.13
In his motion, respondent raises no objection to the above-stated conclusions. He objects solely to the method we used to determine the amount of underreported gross profit. In our original opinion, since we determined that petitioner received $29,767.81 in gross receipts, as opposed to the $22,772 reported on the schedule C attached to his 1970 Federal income tax return, we further determined that petitioner underreported his gross receipts by $6,995.81. Since petitioner offered no evidence of his cost of goods sold, we stated that we would consider the $6,995.81 as representing not only gross receipts, but also profit. We then concluded that petitioner received total gross profit of $7,486.94, comprised of the $6,995.81 figure and the above-referred to $491.13 figure, as compared to the $5,471 gross business profit shown on petitioner's schedule C. Finally, we substracted out the gross profit figure shown on the return from the redetermined gross *276 profit figure to arrive at the underreported gross profit. In his motion, respondent contends that our computations should have ended once we arrived at the $7,486.94 figure. Respondent contends that subtracting out the gross profit figure reflected on petitioner's schedule C is duplicative of eliminating from the computations the reported gross receipts of $22,772. We have reconsidered our calculations and, although we will not adopt the calculations set forth in respondent's motion, we are inclined to agree that adjustments in our own calculations are warranted. On a second examination of our calculations, we believe that our attempt to somehow reconcile our redetermined gross receipts figure with the reported gross receipts figure was in error. We could not at the time we reached our initial decision, and still cannot, determine with any degree of comfort that any portion of the redetermined gross receipts in the amount of $29,767.81 was actually included in the $22,772 gross receipts reported by petitioner. Considering petitioner's contention at trial and his statement on motion that there was no evidence to link him to the $12,267.81 item, it is doubtful that any portion *277 of this item was reported on petitioner's return. In light of our inability to reconcile in any meaningful manner the figures reported on petitioner's return with our redetermined figures, we believe that the correct methodology to pursue in arriving at petitioner's underreported gross profit is to ascertain as best we can petitioner's gross profit on the transactions before us and then, in effect, to give petitioner credit for the gross profit reported on his return. In so adopting this methodology, we emphasize that the record in this case leaves much to be desired, and we are relegated to making as close an approximation as we can. We were able to determine with relative certainty that $17,500 of gross receipts received by petitioner in 1970 resulted in a profit of $491.13. We also were able to determine that petitioner received an additional $12,267.81 in gross receipts. Petitioner offered no evidence of cost of goods sold to support a reduction in the $12,267.81 gross receipts. Accordingly, for purposes of recomputing the amount of underreported gross profit, we believe it appropriate to consider the $12,267.81 item as gross profit. Thus, we conclude that, based on the evidence *278 before us, and in some instances, the lack thereof, petitioner received gross profit of at least $12,758.94 ($491.13 + $12,267.81).On his schedule C, petitioner actually reported gross profit of only $5,471. Under the assumption that some of the transactions in question may have been reflected in petitioner's gross profit computations, we will reduce our redetermined gross profit figure in the amount of $12,758.94 by the gross profit figure of $5,471 reflected on petitioner's schedule C to arrive at an underreported gross profit of $7,287.94.The deficiency for 1970 must be recomputed in light of our conclusion that petitioner underreported his gross profit by $7,287.94. Accordingly, respondent's motion for reconsideration of opinion is granted. An approprite order will be entered.